U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 DEC -2 PM 4:56

CLERK

BY _____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

TOM DALEY, MARTY HOLSTIEN, and
TERRANCE REGAN, individually and on
behalf of all others similarly situated,

           Plaintiffs,

   v.

TOYOTA MOTOR NORTH AMERICA, INC.,

           Defendant.

Case No. 2:24-cv-1318

**CLASS ACTION**

**JURY TRIAL DEMANDED**

**PLAINTIFFS' CLASS ACTION COMPLAINT**

Plaintiffs Tom Daley, Marty Holstien, and Terrance Regan ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following with personal knowledge as to themselves based upon the investigation of their counsel, and on information and belief as to all other matters.

## NATURE OF THE ACTION

1.     This is a class action lawsuit against Defendant Toyota Motor North America, Inc. ("Toyota" or "Defendant") by Plaintiffs on behalf of themselves and a class of current and former owners and lessees of model year 2022-2024 Toyota Tundra and Toyota Tundra hybrid vehicles (the "Class Vehicles" or "Vehicles").

2.     The engines in the Class Vehicles suffer from a serious defect which causes them to stall and, in some cases, fail completely (the "Engine Defect" or "Defect"). The Engine Defect stems from or is related to debris that is contained on the inside of the engines in the Class Vehicles. When the Defect manifests, the Class Vehicles will not accelerate even while the driver is engaging the gas pedal. Suddenly, after a delay, the car will accelerate forward. This unsafe condition is referred to by consumers as "throttle lag," "jolting," or "lurching." This presents a serious safety concern because Class Vehicles respond to input in the accelerator on a delayed basis. This can result in numerous unsafe driving scenarios, including Class Vehicles being rear-ended because they fail to accelerate or rear-ending other vehicles, e.g., at a stop light or stop sign, because the Class Vehicles jolt forward on a delayed basis from the stopped position.

3.     The Engine Defect also can cause catastrophic engine failure which can leave drivers and passengers stranded and stuck with extensive repairs and other economic injuries.

4.     Toyota is aware of the Engine Defect and its related issues. In fact, it has announced that it is preparing to initiate an unspecified "remedy" at some unknown point in the future. On or

- 1 -

## PLAINTIFFS' CLASS ACTION COMPLAINT

around May 30, 2024, Toyota filed a Safety Recall Report – report no. 24V-381– with the National

Highway Traffic Safety Administration ("NHTSA") which states that Toyota will be recalling certain

Class Vehicles equipped with a V35A engine (the "Recall").[1] The 24V-381 Recall specifically applies

to certain 2022-2023 Tundras. The Recall states: "an engine stall [that occurs in these vehicles] while

driving leads to a loss of motive power. A vehicle loss of motive power while driving at higher speeds

can increase the risk of a crash."[2]

     5.     Setting aside the unanswered question as to whether the Engine Defect can be fixed,

there are obvious shortcomings in the Recall. It fails to account for other vehicles with substantially

similar engine builds which are also experiencing the Engine Defect, e.g., 2024 model year Tundras

and Tundra hybrid models. With respect to Tundra hybrids, Toyota's stated reason for exlcuding them

is that "[s]ome of these vehicles equipped with a different engine configuration have a Hybrid

powertrain system. If engine failure occurs on a Hybrid vehicle, the vehicle continues to have some

motive power for limited distances and the driver receives a continuous audible warning, warning

lamps, and visual warning messages."

     6.     For the Class Vehicles that the Recall *does* cover, owners and lessees are still left in

the lurch. Toyota mailed an "Interim Notice" to 2022-2023 Tundra vehicle owners and lessees

acknowledging that "[a] loss of motive power while driving at higher speeds can increase the risk of

crash."[3] Yet the same notice says that Toyota is "currently developing the remedy."[4] Toyota will

---

[1] https://static.nhtsa.gov/odi/rcl/2024/RCLRPT-24V381-8668.PDF (last visited Nov. 24, 2024).

[2] *Id.*

[3] Toyota Interim Notice 24 TB07 (May 30, 2024), https://static.nhtsa.gov/odi/rcl/2024/RCMN-24V381-3977.pdf

[4] *Id.*

PLAINTIFFS' CLASS ACTION COMPLAINT

notify owners "when the remedy becomes available."[5] Correspondence between NHTSA and Toyota, dated June 3, 2024, similarly states that "[t]he remedy is currently under development."[6]

7.      The result of all of this is that Plaintiffs and class members who paid to purchase or lease a Class Vehicle are currently stuck driving a vehicle that Toyota knows is dangerous, but has no concrete timetable for a workable fix. Certain class members have visited Toyota dealerships and have been told Toyota cannot replicate the problem in their vehicle and/or to simply wait for the "remedy." And, as noted above, a portion of the Class Vehicles (Tundra hybrids and 2024 Tundras) are not even included in the Recall and related "remedies."

8.      Plaintiffs and class members should not be forced to wait it out for a potential fix or remedy—which is not even guaranteed to be effective and eliminate the Engine Defect—while they continue to be exposed to and/or experience the dangerous Engine Defect in their Class Vehicles and incur costs and other lossess related to the Engine Defect. This is an entirely unfair and unsafe scenario in which Toyota has placed Tundra owners and lessees.

9.      Plaintiffs bring this action to seek damages for Toyota's breach of implied warranties, consumer fraud and omissions, unjust enrichment, and violations of state consumer protection laws. They also seek declaratory and injunctive relief to address Toyota's ongoing misconduct.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 because the claims relating to the matter in controversy exceed $5 million, exclusive of interest and costs, the proposed classes have at least 100 members, and this is a class action in which certain

---

[5] *Id.*

[6] NHTSA Letter to Cory Hoffman, General Manager of Toyota Engineering & Manufacturing (June 3, 2024), https://static.nhtsa.gov/odi/rcl/2024/RCAK-24V381-9859.pdf

PLAINTIFFS' CLASS ACTION COMPLAINT

of the class members (including Plaintiffs) and Toyota are citizens of different states. *See* 28 U.S.C. § 1332(d)(2)(A)

11.     Venue is proper in this judicial District under 28 U.S.C. § 1391 because at least one Plaintiff resides in this District and Toyota conducts significant business throughout this District.

12.     At all pertinent times, Toyota was engaged in the marketing, advertisement, sale, and lease of the Class Vehicles, which are the subject of this lawsuit, in this District and throughout the United States.

## PARTIES

**Plaintiff Tom Daley**

13.     Plaintiff Tom Daley is an adult individual who resides in and is a citizen of Fairlee, Vermont. In or around March 2022, Plaintiff Daley purchased a new 2022 Toyota Tundra at White River Toyota, an authorized Toyota dealership located in White River Junction, Vermont. At the time of purchase, Plaintiff also purchased an extended warranty for his Vehicle, which cost Plaintiff $1,790.00. In total, Plaintiff Daley spent $59,726.28 for his Tundra. Plaintiff Daley uses his Class Vehicle for family and household use, and to get to and from work.

14.     In or about late 2022/early 2023, Plaintiff Daley began experiencing the Defect. When driving his Class Vehicle, Plaintiff reports experiencing a throttle lag when attempting to move forward from slower speeds or a stopped position, followed by a jarring surge of his Vehicle.

15.     Plaintiff Daley continues to experience the unsafe Defect and resultant throttle lag and surging of his Vehicle, as he continues to drive his Class Vehicle.

16.     Plaintiff Daley feels unsafe operating his Vehicle due to the pedal lag and jarring surging of his Vehicle.

PLAINTIFFS' CLASS ACTION COMPLAINT

17.     Because of the Defect, and Toyota's inability or refusal to permanently remedy the issue, Plaintiff continues to be exposed to a safety risk associated with the surging or jolting of his Class Vehicle.

18.     At the time of purchasing his Vehicle, Plaintiff did not know that the Vehicle contained an unsafe throttle lag Defect that caused surging and jolting, and that he would not be able to safely drive the Vehicle without risk of the pedal lag and surging Defect. Toyota omitted this information, which was material to Plaintiff's purchasing decision, given the significant safety implications of the throttle lag Defect. He relied on and was deceived by this omission in deciding to purchase his Vehicle. Plaintiff Daley has owned multiple previous Toyota Tundra vehicles. Had Toyota disclosed the Defect on its website, through its dealership, in its warranty manual, or elsewhere prior to Plaintiff purchasing his Class Vehicle, Plaintiff Daley would not have purchased the Vehicle, or would not have paid the purchase price that he did. Plaintiff relied upon Toyota that it was providing the full picture of information regarding his Vehicle, and relied upon the idea that Toyota would not withhold material information about safety defects in the Vehicle, including the Defect. As a result, Plaintiff received less than what he paid for the Vehicle and did not receive the benefit of his bargain.

**Plaintiff Marty Holstien**

19.     Plaintiff Marty Holstien is a citizen and resident of Eagle Point, Oregon. In or around July 2022, Mr. Holstien purchased a 2022 model year Tundra from the Grants Pass Toyota dealership in Grants Pass, Oregon.

20.     Within a few weeks of purchasing and driving his Vehicle, Plaintiff Holstien began noticing a lag issue that impacted his vehicle's functionality. The gas pedal was not responding to reasonable application of pressure, leading to Plaintiff pressing down harder on the accelerator which

jolted the vehicle forward. This was not an isolated event for Plaintiff, as Plaintiff's Vehicle has exhibited these symptoms regularly since the first incident in 2022 in which, at any point during Plaintiff's drive after decelerating or bringing it to a complete stop, Plaintiff's Vehicle will stutter, lag, or otherwise stall for several seconds. The Vehicle's lack of immediate acceleration, and in some instances followed by a sudden acceleration of the Vehicle following the initial effects of the lag Defect, puts Plaintiff in a vulnerable position on the road.

21.    Mr. Holstien has experienced this Defect several times weekly since his purchase of his Vehicle and it has become a common occurrence that has not been remedied. This throttle lag issue has prevented Mr. Holstien from safely and comfortably being able to drive his vehicle.

22.    In August of 2022, Plaintiff brought his Vehicle into Grants Pass Toyota in order to address his concerns with the Defect. When the Dealership could not recreate the Defect effects, it indicated that the Dealership would not provide a fix for the Defect. Plaintiff continued to bring his Vehicle to the Dealership to address the Defect on several occasions and was repeatedly told that no repair or recourse could be provided for his concerns.

23.    In or around August of 2024, Plaintiff received a notice from Toyota indicating that his vehicle was a part of a Recall affecting 2022 and 2023 model year vehicles of the Toyota Tundra. The Recall notice indicated that debris may contaminate the engine and cause the main bearings to fail, which can result in an engine stall and loss of drive power. Though the dealership has previously indicated that there was no remedy for Plaintiff's concerns, Toyota indicated that the Defect existed and could be remedied but regularly communicated conflicting information to Plaintiff.

24.    On September 18, 2024, Plaintiff had engaged in an inspection conducted by a an authorized technician with Toyota at Toyota Grants Pass. Plaintiff was told that there was no issue

discovered through the Inspection concerning the Defect and its impact on his Vehicle. Plaintiffs have not received this report from Toyota.

25.     Plaintiff continues to suffer from the effects of the Defect. Plaintiff has exhausted time, energy, and miles on his Vehicle attempting address his concerns with the Defect with Toyota.

26.     While the Recall notice established a Defect with certain Class Vehicles that can be remedied, it does not provide a timeline for when the remedy will be distributed to affected class members. Because of the unknown Recall timeline, Plaintiff is unsure when he will safely be able to drive his vehicle.

27.     Plaintiff also believes he has been monetarily impacted by his purchase of the vehicle. Plaintiff paid a premium price for his Vehicle, which is now subject to a Defect and Recall. Plaintiff would not have purchased the Vehicle, or would have paid significantly less for the Vehicle, had Defendant properly relayed the Defect equipped with the vehicle.

28.     At the time of purchasing his Vehicle, Plaintiff did not know that the Vehicle contained an unsafe throttle lag Defect that caused surging and jolting, and that he would not be able to safely drive the Vehicle without risk of the pedal lag and surging Defect. Toyota omitted this information, which was material to Plaintiff's purchasing decision, given the significant safety implications of the throttle lag Defect. He relied on and was deceived by this omission in deciding to purchase his Vehicle. Had Toyota disclosed the Defect on its website, through its dealership, in its warranty manual, or elsewhere prior to Plaintiff purchasing his Class Vehicle, Plaintiff would not have purchased the Vehicle, or would not have paid the purchase price that he did. Plaintiff relied upon Toyota that it was providing the full picture of information regarding his Vehicle, and relied upon the idea that Toyota would not withhold material information about safety defects in

PLAINTIFFS' CLASS ACTION COMPLAINT

the Vehicle, including the Defect. As a result, Plaintiff received less than what he paid for the Vehicle and did not receive the benefit of his bargain.

**Plainitff Terrance Regan**

29.    Plaintiff Terrance Regan is a citizen and resident of Hertford, North Carolina. In or around May 2024, Mr. Regan leased a 2024 model year Tundra from Hall Toyota dealership in Elizabeth City, North Carolina.

30.    On or around August 23, 2024, while driving the vehicle in Montana, Plaintiff Regan grew concerned about the safety and functionality of his vehicle after numerous warning and error codes appeared on the dashboard. Shortly therafter, the engine unexpectedly failed, causing the vehicle to shut down. Mr. Regan and his wife were left stranded by the road due to this incident despite Plaintiff's efforts to address his vehicle's issues, resulting in Plaintiff Regan contacting his motor vehicle insurance company to tow the 2024 Tundra vehicle to an RV campsite in Miles, Montana. Plaintiff subsequently contacted Toyota in order to tow the vehicle from the campsite to the nearest dealership in Billings, Montana.

31.    Plaintiff Regan was not provided any additional or immediate recourse for the engine issue, and was required to pay for six additional nights at the campsite while Toyota inspected Plaintiff's vehicle. Throughout the extended stay, Plaintiff regularly contacted Toyota and the dealership in Billings, Montana to retrieve an update concerning his vehicle but the dealership was unable to provide him with an update or an estimated timeframe for when the vehicle would be safe to drive. Plaintiff continued calling and kept receiving differing and contradictory remarks from Toyota concerning his vehicle.

32.    Notably, the Toyota dealership had identified that the cause of the incident was a result of overflowing oil in Plaintiff's vehicle which may have been due to unexpected particles

accumulating in the Vehicle, to which Plaintiff indicated that he had just gotten the vehicle serviced days prior at a Toyota dealership in Great Falls, Montana and this issue had not been caught by the dealership then; Plaintiff indicates that the dealership in Billings said it would investigate this issue but never provided a report on its findings.

33.     Subsequently, the dealership contradicted its previous statement concerning the cause of the engine failure by informing the Plaintiff that a mix of red-dye diesel in the Plaintiff's vehicle's gas tank was the actual reason for the engine failure. However, the Plaintiff had never filled his gas tank with this diesel. Plaintiff continued to contact Toyota and the Billings dealership for six days following the incident with no indication of remedy or update on his vehicle.

34.     Because Mr. Regan needed to return from Montana to North Carolina after the six day unexpected detour, he had no choice but to terminate the lease on his Tundra and abruptly secure another vehice. This change also resulted in unintended out-of-pocket expenses.

35.     Approximately three weeks after Plaintiff's termination of his lease for the 2024 Tundra, Toyota contacted Plaintiff to indicate that his vehicle was ready to be picked up in Billings, Montanta. At this point Plaintiff was already at his home in North Carolina with his new lease vehicle. Toyota did not attempt to contact Plaintiff Regan in the weeks following the termination of his lease to provide updates on the vehicle's engine failure issue, and only contacted Plaintiff when the vehicle's inspection was completed.

36.     Mr. Regan has been injured by virtue of Toyota's conduct described herein. Specifically, he would not have leased the vehicle in the first place (or paid less for it than he did) had he been aware of the undisclosed Engine Defect. He also has incurred in excess of $300 in unreimbursed expenses related to the August 23 incident. Though Plaintiff's auto insurance was able to cover the towing service for up to 35 miles, the remainder of the towing distance fee had to be

covered by Plaintiff, totaling approximately $300. Plaintiff also incurred additional out of pocket expenses due to Plaintiff's lodging needs due to Toyota's inability to quickly diagnose and remedy the Defect in Plaintiff's vehicle and to provide Plaintiff with a loaner vehicle while his vehicle was at the dealership. Plaintiff incurred additional monetary expenses for food and other goods Plaintiff did not anticipate or plan to purchase as a consequence of the Defect and resulting change in his travel plan.

37.    Additionally, because Plaintiff was required to terminate his existing lease with Toyota and acquire a new leased vehicle to transport himself, his wife, and RV back to their North Carolina home, Plaintiff incurred an additional monthly expense for the new lease. Namely, Plaintiff's anticipated monthly lease payment will cost approximately an additional $40, jumping from his $730 monthly payment for the 2024 Toyota Tundra to $770 for his newly leased vehicle.

38.    Due to early termination of his lease, Toyota also indicated that Plaintiff would be required to pay the difference for the remainder of the 2024 Toyota Tundra lease payment after the vehicle was sold at an auction. Toyota has not followed up with Plaintiff regarding this claim.

39.    At the time of purchasing his Vehicle, Plaintiff did not know that the Vehicle contained an unsafe throttle lag Defect that caused surging and jolting, and that he would not be able to safely drive the Vehicle without risk of the pedal lag and surging Defect. Toyota omitted this information, which was material to Plaintiff's purchasing decision, given the significant safety implications of the throttle lag Defect. He relied on and was deceived by this omission in deciding to purchase his Vehicle. Had Toyota disclosed the Defect on its website, through its dealership, in its warranty manual, or elsewhere prior to Plaintiff purchasing his Class Vehicle, Plaintiff would not have purchased the Vehicle, or would not have paid the purchase price that he did. Plaintiff relied upon Toyota that it was providing the full picture of information regarding his Vehicle, and

relied upon the idea that Toyota would not withhold material information about safety defects in the Vehicle, including the Defect. As a result, Plaintiff received less than what he paid for the Vehicle and did not receive the benefit of his bargain.

**Defendant Toyota Motor North America, Inc.**

40.     Toyota Motor North America, Inc. is the American subsidiary of Toyota Motor Corporation. It is headquartered at 6565 Headquarters Drive in Plano, TX 75024. Toyota Motor North America, Inc. is responsible for sales, marketing, service, distribution, import, and export of Toyota branded products throughout the United States. Specifically regarding Class Vehicles, Toyota Motor North America, Inc. is also a warrantor and distributor in the United States.

## FACTUAL ALLEGATIONS

### *Overview of the Toyota Tundra*

41.     The Toyota Tundra was the first-ever full-size pickup truck built by a Japanese automaker in North America. Toyota began production on the Tundra in May 1999 at Toyota Motor Manufacturing, Indiana, before moving to the Toyota Motor Manufacting, Texas plant in San Antonio in 2008.

42.     An image of the Toyota Tundra is depicted below:

PLAINTIFFS' CLASS ACTION COMPLAINT



43.    Toyota sold 125,185 Tundras in 2023 and 94,429 Tundras in 2022.[7] In 2022, Toyota marketed the Tundra at a starting MSRP of approximately $37,000. The 2023 Tundra had a base MSRP of $41,000 and the 2024 model—which Toyota marketed as a redesigned model with updated styling, technology, and performance—had a starting MSRP at approximately $40,000.

44.    Toyota markets the Tundra as being "ready to work hard and play even harder" pairing "remarkably rugged capability with premium comfort and advanced technology to fuel your wildest adventures." Toyota touts the Tundra as delivering "exceptional power without sacrificing efficiency" assuring drivers that "peace of mind comes standard" with the Tundra.

45.    Toyota also offers the Tundra as a hybrid model. The first Tundra hybrid was released in 2022. Since then, Tundra has released hybrid model years for 2022, 2023, and 2024.

46.    The Toyota Tundra hybrids and Toyota Tundra 2024 all have a V35A engine. The

---

[7] https://carfigures.com/us-market-brand/toyota/tundra.

PLAINTIFFS' CLASS ACTION COMPLAINT

V35A is a 3.4 liter, twin-turbo gas engine designed for high horsepower, responsiveness to driver's commands, high gas efficiency, and low emissions.

47.     Each year, Toyota published a brochure to advertise their 2022, 2023, and 2024 Toyota Tundra releases.[8] All three brochures make the following identical promise:

PERFORMANCE

# A force to be reckoned with.

> 22 combined mpg! The moment you step on the gas, you're ready for action. And you can keep on driving wit

Tundra's modern muscle delivers exceptional power without sacrificing efficiency. Equipped to go the extra mile, this full-size pickup has up to an EPA-estimated 22 combined mpg! The moment you step on the gas, you're ready for action. And you can keep on driving with confidence, knowing this truck was built with the quality, durability and reliability Toyota is recognized for.

48.     However, Toyota has not kept this promise. The Class Vehicles fail to start, lose power, or "run rough". Drivers may notice warning signs that include engine knocking or a loss of power while driving. The Engine Defect presents numerous unsafe driving conditions. A worse case scenario occurs when the Vehicles suddenly stop driving in the middle of the highway.

---

[8] *See* https://www.toyota.com/content/dam/toyota/brochures/pdf/2022/tundra_ebrochure.pdf; https://www.toyota.com/content/dam/toyota/brochures/pdf/2023/tundra_ebrochure.pdf; https://www.toyota.com/content/dam/toyota/brochures/pdf/2024/tundra_ebrochure.pdf (last visited Sept. 24, 2024).

*The V35A and Engine Defect*

49.    The V35A engine is extremely intricate. Below is a diagram of a V35A engine[9]:



50.    Multiple, tiny metal components comprise the V35A engine. Keeping the V35A engine heavily lubricated is crucial to prevent metal components grinding against each other, causing metal-on-metal friction and engine wear-and-tear. If the components deteriorate, the engine deteriorates.

51.    The Engine Defect is caused by foreign particles, such as dirt, dust, sludge, or metal shavings which accumulate in the engine during the manufacturing stage. During the manufacturing process, the V35A engine must be properly cleaned of such debris, otherwise the engine can experience performance problems.

52.    If left uncleaned, debris will remain nestled between the metal components, interfering with the operation of the crankshaft main bearings and causing the bearings to fail. These gritty foreign particles obstruct the flow of lubrication between the metal components.

---

[9] https://toyota-club.net/files/faq/19-09-10_faq_df_v6_eng.htm.

Without lubrication, the engine experiences wear and tear, metal-on-particle, and metal-on-metal friction. As the engine components deteriorate, the engine deteriorates too, leading to catastrophic engine failure. As such, the Engine Defect is entirely preventable, and Toyota knew or should have known about the importance of proper engine cleaning, yet failed to perform the necessary pre-release cleaning process, which puts Toyota Tundra drivers at risk of catastrophic engine failure.

53.    One Toyota enthusiast took to Reddit to post images of "machining debris" he found inside the V35A-FTS engine of a brand new vehicle in October 2023:





10

***Class Members' Experiences With the Engine Defect***

54.    The internet is replete with complaints from Class Vehicle owners and lessees who,

like Plaintiffs, have experienced the Engine Defect.

55.    Below are some examples of complaints from owners and lessees of the Class

Vehicles concerning the Engine Defect posted on car news publications, consumer forums, and

NHTSA's website[11]:

> Armen Hareyan, TorqueNews, *7,000 Miles In, My Brand New 2024 Toyota Tundra Turns Into a Warranty Battleground (Seeking Advice!)* (April 25, 2024)[12]
>
> Imagine this: you just bought a brand new 2024 Toyota Tundra truck, and are excited to enjoy it for years to come. Then, at a mere 7,000 miles, the engine lets out a spectacular cough and dies. That's the gut-wrenching scenario facing one truck driver, who posted his

---

10

https://www.reddit.com/r/ToyotaTundra/comments/1ehucs3/the_hanging_chads_known_as_mac
hining_debris/?rdt=52146

[11] NATIONAL HIGHWAY TRAFFIC SAFETY ADMIN., *Safety Issues & Recalls*,
https://www.nhtsa.gov/recalls#vehicle (last visited Apr. 27, 2022).

[12]      https://www.torquenews.com/1/7000-miles-my-brand-new-2024-toyota-tundra-turns-
warranty-battleground-seeking-advice.

story and the accompanying image on 2022+ Toyota Tundra Owners Facebook group seeking advice from fellow Tundra owners.

'Thought I was safe buying a 2024 but I was not. Pretty certain the engine blew at a little over 7,000 miles. Had it towed to the dealership who said they will be pulling/disassembling the engine over the next few days to determine what happened. They said it should be under warranty (it better) but they will need to open a case with Toyota and have them approve it. Has anyone attempted to have Toyota replace a truck with a blown engine? (Not the engine, but give you a brand new truck). I was planning on having this truck for 10-15 years. Have a feeling the truck will never be the same after they completely replace the engine. Trying to decide if I want to immediately push the idea that I need a new truck or see how the repair plays out.'

Complaint from a 2024 Tundra Driver: I just got a brand new 24 trd pro tundra. After about 200-300 miles it started jolting/lurching slightly within one second of coming to a complete stop. It does this like 80% of the time.[13]

Complaint from a 2024 Tundra Driver: Combine that with the turbo lag and it's super annoying and had almost got me into an accident a couple of times. Does anyone else have this issue with their 3rd Gen?[14]

Complaint from a 2024 Tundra Driver: My sons' 2024 Tundra just lost the engine due to bearing debris. He is getting a total run around from both the dealer and Toyota rep. Dealer said it could be eight months to repair as these engines are failing everywhere and the parts could be the problem. It is his work truck and they eventually offered a small SUV. He hauls trailers and SUV doesn't cut it. Stay away from Toyota Tundra.[15]

Complaint from a 2024 Tundra Driver: I know some people were interested in my situation so here is the update on my 2024 Limited Trd offroad IForce Max white 20k miles, but after the engine locked up on me last night, got it towed with toyota road side assistance to the dealer and they started looking into my truck first thing in the morning. So obviously engine is bad, but gratefully they had many short blocks in stock in my area (ottawa-toronto).[16]

Complaint from a 2024 Toyota Tundra Driver: While attempting to cross an intersection after stopping at a stop sign I stepped on the accelerator to go and the Toyota Tundra

---

[13]*See*

https://www.reddit.com/r/tundra/comments/1638iiv/3rd_gen_clunky_shifting_in_low_gearsspeed/ (last visited Sept. 24, 2024).

[14] *See*

https://www.reddit.com/r/tundra/comments/1638iiv/3rd_gen_clunky_shifting_in_low_gearsspeed/ (last visited Sept. 24, 2024).

[15] https://www.reddit.com/r/ToyotaTundra/comments/1cz18k6/2024_engine_failure_update/.

[16] https://www.reddit.com/r/ToyotaTundra/comments/1cz18k6/2024_engine_failure_update/.

PLAINTIFFS' CLASS ACTION COMPLAINT

hesitated momentarily. This hesitation or lag caused me to be in the intersection later than I wanted to be nearly resulting in me being broadsided by a truck. This is not an isolated incident for my vehicle. I posted my issue on a social media site for 2023/24 Toyota Tundra's and the responses confirm that this is an issue that Toyota is aware but has done noting to remedy.[17]

Complaint from a 2024 Toyota Tundra Driver: This truck was a 2024 Tundra platinum. I only had the vehicle for 6 weeks and had only driven it for 2000 miles before the truck started sending low oil notifications. It threw three of them over the weekend and the dealer I purchased it from was not open and the other local dealers could not get me in. I took the truck to valvoline to have them check the oil. They recorded the entire process, I have the video evidence of the oil change. At the time of this oil change you can clearly see when they drain the oil in that the truck is low about 4. 5-4. 7 of the 7. 7 quarts of oil in its capacity. 5 days later I get all these errors and I have it towed to the dealer and they are now telling me that the engine is blown and that they will not honor the warranty because it didn't have a Toyota filter on it, even though it had the correct aftermarket oil filter on it they still elected to deny it and are refusing to do anything for me. This is a leased truck that I bought additional coverage on and they still want me to buy a new engine for roughly $25k. It seems evident that the 2024 hybrid Tundra motors are also having the same metal shavings in the oil pan. Toyota and the dealer have both treated me like a bastard red headed stepchild and jerked me around for 3 days only to tell me to call some 800 number and that at some point in the future Toyota will send out and engineer to evaluate. Meanwhile I'm without a truck (which I need for my business) dealer won't give me a loaner and won't offer to atleast split the rental charges with me. If you look into this engine further you will find that there are countless horror stories of this same engine having the identical 22-23 engine issues. And they won't give me a formal warranty denial letter so I can take them to court over this. This was my 5th Toyota/Lexus in my 20 years of driving and the way that Toyota and the dealer have treated me is absolutely criminal, they even deleted the low oil notifications so hide the evidence.[18]

Complaint from a 2024 Toyota Tundra Driver: Purchased 2024 Toyota Tundra from dealer brand new with 3 miles. Noticed tapping noise coming from engine area. Reported to service and Toyota specialists claimed to be normal. Same day recall 24ta07 was reported for engine debris found from production machining. Dealer suggested to take to another dealer for second opinion. Second dealer also claimed it is normal, but still they are replacing torque converter and transmission to try and eliminate the noise that they claim is normal. Videos of engine noises are not able to be uploaded. They can identify the problem is happening on 2024 Tundra as well.[19]

---

[17]https://www.carproblemzoo.com/toyota/tundra/2024/engine-and-engine-cooling-problems.php#google_vignette

[18] *Id.*

[19] *Id.*

Complaint from a 2024 Tundra Hybrid Driver: I'm obviously bringing it to the dealer. It's hard not to vent when you're 80k (Canadian) truck has died twice in a year and you need to get it towed on a flatbed. When you buy a Toyota for reliability. It should be embarrassing to an organization. I love my truck (when it works) and I don't complain about the little things. But again, when your brand new truck dies multiple times a year, and you have to wait hours for a tow through Toyota, go weeks without a vehicle, and fight to get a Kia forte rental it's an issue. Not having a truck for weeks will affect my life. I'm currently doing landscaping at my house that will now be on hold, my family camping weekend plans will have to be cancelled. It's not really a minor inconvenience like my radio knob fell off (which it did, lol). you have a 24 limited. It's easy to sit back and criticize people that are frustrated with their subpar product. I hope if you have major issues won't make a peep anywhere.[20]

Complaint from a 2023 Toyota Tundra Hybrid Driver: The contact received notification of NHTSA Campaign Number: 23V566000 (Fuel System, Gasoline) however, the part to do the recall repair was not yet available. The local dealer was made aware of the issue and confirmed that parts were not yet available. The contact stated that the manufacturer had exceeded a reasonable amount of time for the recall repair. The manufacturer was made aware of the issue.[21]

Complaint from a 2022 Toyota Tundra Hybrid Driver: Creating this thread for all the hybrid owners since we are not part of the Recall…Yet…It is the same engine…In the meantime, my Tundra will sit, with the knowledge that my truck can create an unsafe situation, I can't put my family or others in danger and knowing that this failure can create the potential just makes me want to park it. Also, I don't want to be liable with the knowledge that I could hurt someone.[22]

Armen Hareyan, TorqueNews, *He Has Another Dead Hybrid Tundra and Brings it to Forum, Facing Rage vs. Dealership Dash* (Jul. 23, 2024)[23]

---

[20] https://www.tundras.com/threads/another-dead-tundra.144239/.

[21] https://www.nhtsa.gov/vehicle/2023/TOYOTA/TUNDRA%252520HYBRID/PU%25252FCC/2WD#complaints

[22] https://www.tundras.com/threads/safety-recall-for-engines-for-hybrid-owners-only-chime-in-if-you-are-having-issues.143631/.

[23] https://www.torquenews.com/1/he-has-another-dead-hybrid-tundra-and-brings-it-forum-instead-toyota-dealer-because-he-has#google_vignette.

My 23 Tundra hybrid died again today. Last time it needed a hybrid inverter. This time who knows? I was driving and got a "hybrid malfunction" then a 12v charging malfunction, and a parking brake malfunction and it seemed to be driving fine. Then when I was slowing down it seemed to shift into hybrid mode and died completely. Now I can't start it. It's hard not to start complaining about this truck.





***Toyota Had Knowledge that the Class Vehicles' Engines Are Defective***

56.    At the same time Toyota was selling Class Vehicles to Plaintiffs and the car-buying public, it was well aware of the Engine Defect.

57.    First, Toyota closely reviews Toyota and Toyota-related automobile message boards,

consumer websites, complaints on the NHTSA website, and other websites and sources relating to its vehicles and defects, complaints, or other issues pertaining to the Toyota's vehicles, including the Class Vehicles. It specifically pays considerable attention to engine issues in its automobiles, as properly functioning engines are crucial for safe vehicle operation. Indeed, the engine is essentially the heart of an automobile.

58.    Toyota specifically monitors customers' complaints made to NHTSA. Federal law requires automakers like Toyota to be in close contact with NHTSA regarding potential automobile defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

59.    Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of its ongoing obligation to identify potential defects in their vehicles, including safety-related defects. *Id.* Defendant is Toyota Japan's agent to interface with NHTSA to monitor complaints, respond to inquiries, conduct recalls, and assist NHTSA with investigations. Thus, Toyota knew or should have known of the complaints about the Defect logged by NHTSA Office of Defect Investigation (ODI), and the content, consistency, and large number of those complaints alerted, or should have alerted, Toyota to the Engine Defect.

60.    Second, Toyota recalled certain Class Vehicles on May 20, 2024. At that time, Toyota indicated that it had identified 824 engine warranty claims stemming from the Engine Defect. However, Toyota's recall expressly excluded Tundra hybrid models and 2024 models despite the fact

that these vehicles suffer from the same Engine Defect as the recalled models. Toyota attempted to justify the exclusion of hybrid models on the basis that "[i]f engine failure occurs on a Hybrid vehicle, the vehicle *continues to have some motive power for limited distances . . . .*".[24] Yet, this is clearly not enough to protect consumers suffering from catastrophic engine failure. Toyota's May 20, 2024 recall is deficient in scope, as well as in its remedy.

61.     Third, Toyota's pre-sale testing revealed the Engine Defect to Toyota. Toyota requires that each component in its vehicles is tested for durability and functionality before mass production. Toyota employs several teams of engineers whose work is focused on testing the durability of engines and engine performance, including but not limited to reliability test engineers responsible for guaranteeing full vehicle and component performance for durability requirements.

62.     Further, Toyota does road and other real-life testing to replicate average consumer use of its vehicles. Road testing, for example, is one of the industry-standard testing that Toyota performs on the Vehicles to identify any issues with engine performance and durability. Because such tests replicate real, actual consumer use of the Vehicles, Toyota's testing necessarily would have revealed the Engine Defect. Because Toyota performed this testing before taking the Vehicles to the market for sale, Toyota discovered, and knew or should have known about, the Engine Defect before the Vehicles were sold or leased.

63.     Federal regulations require automobile manufacturers to build vehicles that comply with the Federal Motor Vehicle Safety Standards (49 C.F.R. § 571). The existence of these standards necessarily requires Toyota to extensively test its vehicles prior to selling them. During the course of

---

[24] Toyota Vehicle Safety & Compliance Liaison Office, *Defect Information Report* (May 30, 2024), Page 2, available at: https://static.nhtsa.gov/odi/rcl/2024/RMISC-24V381-8150.pdf

these and other quality validation testing conducted by its engineers prior to their sale, Toyota became aware of the Engine Defect.

64.     Toyota was also aware of the Defect based upon the raft of negative consumer responses and reactions about the Class Vehicles (numerous of which are above), yet it continued to sell and lease the Vehicles with the Engine Defect.

65.     Toyota had knowledge, or should have known, about the Engine Defect from all of these sources, but it has done nothing to remedy the Engine Defect. It issued a Recall that does not address the Engine Defect universally and simply signals a future remedy for only those vehicles expressly covered by the Recall; continues to sell Class Vehicles with a well-known safety issue; declined to issue a comprehensive recall covering all models and model years impacted despite the prevalence of the issue; and has sat on its hands as Toyota dealerships routinely charge class members large sums of money when they present their Vehicles for repair of the Engine Defect after it inevitably manifests.

66.     Toyota had knowledge that its omissions regarding the safety and performance of the Vehicle were misleading, yet it continued to make the same omissions regarding the Vehicles to Plaintiffs and members of the proposed classes, despite the fact that Toyota knew that the Vehicles were defective.

67.     To date, Toyota has failed to remedy the Defect and continues to sell and lease the Class Vehicles despite its knowledge of the Defect.

68.     To date, Toyota has not demonstrated that it is capable of providing an adequate repair for the Defect, and Plaintiffs and class members do not know whether Toyota is capable of providing a repair for the Defect. As such, and without the benefit of discovery, it is for all practical purposes impossible to know at this time whether a remedy at law or in equity will provide the appropriate full

relief for Plaintiffs and members of the class. As a result, Plaintiffs, at this stage of the litigation, seek

both restitution and a remedy at law, where the claims so permit. Further, Plaintiffs seek an injunction

enjoining Toyota and its agents, servants, and employees, and all persons acting under, in concert

with, or for it from selling or leasing Class Vehicles without notice that they are subject to the Defect,

which cannot be repaired.

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

69.     Any applicable statute of limitations have been tolled by Defendant's knowing and

active concealment of the Engine Defect and omissions alleged herein. Through no fault or lack of

diligence, Plaintiffs and class members were deceived regarding the Class Vehicles and could not

reasonably discover the Engine Defect or Defendant's deception with respect to the Defect.

70.     Plaintiffs and class members did not discover and did not know of any facts that would

have caused a reasonable person to suspect that the Defendant was concealing a defect and/or the

Class Vehicles contained the Defect and the corresponding safety risk. As alleged herein, the

existence of the Defect was material to Plaintiffs and members of the class at all relevant times. Within

the time period of any applicable statutes of limitations, Plaintiffs and class members could not have

discovered—through the exercise of reasonable diligence—the existence of the Engine Defect or that

the Toyota was concealing it.

71.     At all relevant times, Toyota was under a continuous duty to disclose to Plaintiffs and

class members the true standard, quality, and grade of the Class Vehicles and to disclose the Engine

Defect and corresponding safety risks due to Toyota's exclusive and superior knowledge of the

existence and extent of the Engine Defect in Class Vehicles.

72.     Toyota knowingly, actively, and affirmatively concealed the facts alleged herein, and

the Engine Defect. Plaintiffs and class members reasonably relied on Toyota's knowing, active, and

affirmative concealment.

73.    For these reasons, all applicable statutes of limitation have been tolled based on the

discovery rule and Toyota's fraudulent concealment, and Toyota is estopped from relying on any

statutes of limitations.

## CLASS ACTION ALLEGATIONS

74.    Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Plainitffs seek to

represent the following Nationwide Class and, alternatively the Vermont, North Carolina and Oregon

Classes defined below:

> **Nationwide Class**
> All owners and lessees of model year 2022, 2023, and 2024 Toyota Tundra and Tundra
> hybrid vehicles purchased or leased in the United States or its territories.
>
> **Vermont Class**
> All owners and lessees of model year 2022, 2023, and 2024 Toyota Tundra and Tundra
> hybrid vehicles purchased or leased in the state of Vermont.
>
> **North Carolina Class**
> All owners and lessees of model year 2022, 2023, and 2024 Toyota Tundra and Tundra
> hybrid vehicles purchased or leased in the state of North Carolina.
>
> **Oregon Class**
> All owners and lessees of model year 2022, 2023, and 2024 Toyota Tundra and Tundra
> hybrid vehicles purchased or leased in the state of Oregon.

75.    Excluded from the classes are Toyota, Toyota's affiliates, officers, and directors, and

the Judge(s) to whom this case is assigned. Plaintiffs reserve the right to amend the definition of the

classes if discovery and/or further investigation reveal that the classes should be expanded or

otherwise modified.

PLAINTIFFS' CLASS ACTION COMPLAINT

76.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

77.     **Numerosity:** The members of the class are so numerous that joinder of all class members in a single proceeding would be impracticable. Based upon their investigation and public reports, Plaintiffs belive the class includes tens of thousands of individuals.

78.     **Existence/Predominance of Common Questions of Fact and Law:** Common questions of law and fact exist as to all class members and predominate over questions affecting only individual class members, including but not limited to:

        a.    whether Toyota engaged in the conduct alleged herein;

        b.    whether Toyota omitted material facts to purchasers and lessees of Class Vehicles;

        c.    whether Toyota's omissions regarding the Class Vehicles were likely to mislead a reasonable consumer;

        d.    whether Toyota breached warranties with Plaintiffs and the other class members;

        e.    whether the Class Vehicles were worth less than as represented as a result of the Engine Defect and conduct alleged herein;

        f.    whether Plaintiffs and the other class members have been damaged and, if so, the extent of such damages; and

        g.    whether Plaintiffs and the other class members are entitled to equitable relief, including but not limited to, restitution and injunctive relief.

79.     Toyota engaged in a common course of conduct giving rise to the legal rights

sought to be enforced by Plaintiffs individually and on behalf of the other class members. Similar

or identical statutory and common law violations, business practices, and injuries are involved.

Individual questions, if any, are substantially overcome, in both quality and quantity, by the

numerous common questions that dominate this action.

80.    **Typicality**: Plaintiffs' claims are typical of the claims of the other class members

because, among other things, Plaintiffs and the other class members were injured through the

substantially uniform misconduct described above. As with Plaintiffs, class members also

purchased or leased a Class Vehicle containing the Engine Defect. Plaintiffs are advancing the

same claims and legal theories on behalf of themselves and all other class members, and no defense

is available to Toyota that is unique to Plaintiffs. The same events giving rise to Plaintiffs' claims

for relief are identical to those giving rise to the claims of all class members. Plaintiffs and all class

members sustained monetary and economic injuries including, but not limited to, ascertainable

losses arising out of Toyota's wrongful conduct in selling/leasing and failing to remedy the Class

Vehicles.

81.    **Adequacy**: Plaintiffs are adequate class representatives because they will fairly

represent the interests of the class. Plaintiffs have retained counsel with substantial experience in

prosecuting consumer class actions, including consumer fraud and automobile defect class action

cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of

the class they seek to represent and have the resources to do so. Neither Plaintiffs nor their counsel

have any interest adverse or antagonistic to those of the class.

82.    **Superiority**: A class action is superior to any other available means for the fair and

efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered

in the management of this class action. The damages or other detriment suffered by Plaintiffs and

the other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Toyota, so it would be impracticable for class members to individually seek redress for Toyota's wrongful conduct. Even if class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden. Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents no significant management difficulties, if any, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

83.    Toyota has acted and refused to act on grounds generally applicable to the class(es), making appropriate final injunctive relief with respect to the class(es) as a whole.

84.    Upon information and belief, class members can be readily identified and notified based upon, *inter alia*, the records (including databases, e-mails, dealership records and files, etc.) Toyota maintains regarding its sales and leases of Class Vehicles.

85.    Unless the classes are certified, Toyota will improperly retain monies that they received from Plaintiffs and class members as a result of its conduct. Unless Toyota is required to change its conduct, it will continue to commit the violations and acts alleged herein and the members of the class and the general public will continue to be misled and harmed.

## CAUSES OF ACTION

### COUNT I
### Breach of the Implied Warranty of Merchantability
### (On Behalf of the Nationwide Class or, in the alternative, the State Classes)

86.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

87.    This claim is brought by Plaintiffs on behalf of the Nationwide Class, or in the alternative, on behalf of the State Classes under those respective states' laws.

88.    Defendant is and was at all relevant times a merchant with respect to the Class Vehicles, and manufactured, distributed, warranted and sold the Class Vehicles.

89.    A warranty that the Vehicles were in merchantable condition and fit for the ordinary purposes for which they were sold is implied by law.

90.    Plaintiffs and the other class members purchased the Vehicles manufactured and sold by Defendant in consumer transactions.

91.    The Vehicles, when sold and at all times thereafter, were not in merchantable condition and were not fit for the ordinary purpose for which cars are used. The Vehicles left Defendant's possession and control with the Engine Defect that rendered them at all times thereafter unmerchantable, unfit for ordinary use, unsafe, and a threat to safety.

92.    Defendant knew before the time of sale to Plaintiffs and the other class members, or earlier, that the Vehicles were produced with the Engine Defect that that rendered the Vehicles unfit for their ordinary use and purposes, and that posed a serious safety threat to drivers, passengers, and everyone else sharing the road with the Vehicles. This knowledge was based on complaints about the Vehicles online, on message boards, directly to it, and to NHTSA; Defendant's own industry standard internal validation of its vehicles prior to launching a new model and internal testing; knowledge about and familiarity with the engine included in the Vehicles; history of similar problems in prior models; and comprehensive data (e.g., warranty and repairs data) provided to it by its dealerships.

93.    The existence and ubiquity of the Engine Defect is illustrated by the numerous publicized consumer complaints, disputes, and failed remedial measures nationwide.

94.    Despite Plaintiffs' and the other class members' normal, ordinary, and intended uses,

PLAINTIFFS' CLASS ACTION COMPLAINT

maintenance, and upkeep, the Vehicles experienced and continue to experience the Engine Defect.

95. The engines in the Vehicles and the Vehicles themselves are, and at all times and were, not of fair or average quality, and would not pass without objection.

96. All conditions precedent have occurred or been performed.

97. Plaintiffs and class members have used their Vehicles in a manner consistent with the Vehicles' intended use, and have performed each and every duty required under Toyota's warranty, including presentment, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

98. Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, have failed and refused to offer (or cannot offer) an effective remedy.

99. In addition, upon information and belief, Defendant received numerous complaints, notices of the need for repair and resulting safety issues, and requests for warranty repairs and coverage relating to the Defect from other members of the class.

100. In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to disclaim or otherwise limit its warranties in a manner that would exclude or limit coverage for the Defect that was present at the time of sale and/or lease, which Defendant knew about prior to offering the Vehicles for sale and/or lease, and which Defendant did not disclose and did not remedy prior to (or after) sale and/or lease, is unconscionable, and Defendant should be estopped from pursuing such defenses.

101. Further, any attempt by Defendant to disclaim or otherwise limit liability for the Engine Defect fails because Toyota and its agents have wrongfully, uniformly, and repeatedly refused and failed to properly repair the Engine Defect.

102.    Specifically, Defendant's warranty disclaimers, exclusions, and limitations, to the extent that they may be argued to apply, were, at the time of sale, and continue to be, unconscionable and unenforceable to disclaim liability for a known, latent defect. Defendant knew when it first made these warranties and their limitations that the defect existed, and the warranties might expire before a reasonable consumer would notice or observe the defect. Defendant also failed to take necessary actions to adequately disclose or cure the Engine Defect after the existence of it came to the public's attention and sat on its reasonable opportunity to cure or remedy the Engine Defect, its breaches of warranty, and consumers' losses. Under these circumstances, it would be futile to enforce any informal resolution procedures or give Defendant any more time to cure the Engine Defect or cure its breaches of warranty.

103.    As such, Defendant should be estopped from disclaiming liability for its actions.

104.    Privity of contract is not required for consumer implied warranty claims under the relevant laws. However, Plaintiffs and the other class members had sufficient direct dealings with Defendant and its agents (dealers) to establish privity of contract. Defendant, on the one hand, and Plaintiffs and the other class members, on the other hand, are in privity because of Toyota's New Vehicle Limited Warranty, which Defendant extends to Plaintiffs and the other class members.

105.    Toyota's authorized dealers are agents of Toyota, and there is a factually plausible agency relationship between Toyota and its dealerships. This agency is factually supported by at least the following: 1) Toyota issued a December 16, 2022 TSB to its dealerships relating to the throttle lag at issue in this litigation; 2) Toyota's warranty directs Class Vehicle owners to present their vehicles to Toyota-authorized dealerships for repairs; and 3) Toyota requires dealerships to submit detailed data to it regarding warranty claims and repairs performed at dealerships. These considerations demonstrate the agency relationship between Toyota and its dealerships, with whom

Plaintiffs interacted and transacted as alleged herein.

106.   Privity is also not required in this case because Plaintiffs and the other class members are intended third-party beneficiaries of contracts between Defendant and its dealers (i.e., its agents); specifically, they are the intended beneficiaries of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Vehicles; the warranty agreements were designed for, and intended to benefit, only the ultimate consumers—such as Plaintiffs and the other class members.

107.   Plaintiffs and the other class members suffered and will suffer diminution in the value of their Vehicles, out-of-pocket losses related to repairing, maintaining, and servicing their defective Vehicles, costs associated with arranging and obtaining alternative means of transportation, and other incidental and consequential damages recoverable under the law.

## COUNT II

### Fraud/Fraudulent Omission
### (On Behalf of the Nationwide Class or, in the alternative, the State Classes)

108.   Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

109.   This claim is brought by Plaintiffs on behalf of the Nationwide Class, or in the alternative, on behalf of the State Classes under those respective states' laws.

110.   Defendant actively, intentionally, and knowingly concealed, suppressed, and/or omitted material facts including the existence of the Defect and the standard, quality, or grade of the Vehicles and the fact that the Vehicles contain a Defect and corresponding safety risk, with the intent that Plaintiffs and class rely on Defendant's omissions. As a direct result of the Defendant's fraudulent conduct, as alleged herein, Plaintiffs and members of the class have suffered actual damages.

111.   Defendant knew at the time of sale or lease and thereafter that the Vehicles contained

PLAINTIFFS' CLASS ACTION COMPLAINT

the Defect, omitted material information about the safety of the Vehicles, and actively concealed the Defect and never intended to adequately repair the Defect during the warranty periods. To date, Defendant has not provided Plaintiffs and members of the class with an adequate repair or remedy for the Defect.

112.    Defendant possessed superior and exclusive knowledge regarding the Defect, and therefore had a duty to disclose any information relating to the safety and functionality of key safety features in the Vehicles.

113.    The Defect is material to Plaintiffs and the members of the class because Plaintiffs and the members of the class had a reasonable expectation that the Vehicles would not contain a Defect that leads to an unsafe condition causing "jolting," "throttle lag," or "lurching," and loss of motive power that exposes them and others to a safety risk. No reasonable consumer expects a vehicle to contain a concealed Defect, such as the Defect as well as its associated safety risk.

114.    Plaintiffs and members of the class would not have purchased or leased the Vehicles but for Defendant's omissions and concealment of material facts regarding the nature and quality of the Vehicles and the existence of the Defect and corresponding safety risk, or would have paid less for the Vehicles.

115.    Toyota knew its concealment and suppression of the Defect was false and misleading and knew the effect of concealing those material facts. Toyota knew its misstatements, concealment, and suppression of the Defect would sell more Vehicles and would discourage Plaintiffs and the members of the Class from seeking replacement or repair of the Defect during the applicable warranty periods. Further, Defendant intended to induce Plaintiffs and class members into purchasing or leasing the Vehicles and to discourage them from seeking replacement or repair of the Defect in order to decrease costs and increase profits.

116.    Defendant acted with malice, oppression, and fraud.

117.    Plaintiffs and the members of the class reasonably relied upon Defendant's knowing misrepresentations, concealment and omissions. As a direct and proximate result of Defendant's misrepresentations, omissions and active concealment of material facts regarding the Defect and the associated safety risk, Plaintiffs and the members of the Class have suffered actual damages in an amount to be determined at trial.

## COUNT III

### Violations of the Vermont Consumer Protection Act, 9 V.S.A. § 2451 *et seq.*
### (On Behalf of Plaintiff Daley and the Vermont Class)

118.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

119.    This claim is brought by Plaintiff Daley on behalf of the Vermont Class.

120.    The Vermont Consumer Fraud Act was created to protect citizens from unfair and deceptive acts in consumer transactions. *Wilder v. Aetna Life & Cas. Ins. Co.*, 433 A.2d 309, 310 (Vt. 1981).

121.    Pursuant to the Vermont Consumer Fraud Act, 9 V.S.A. § 2453, a party violates the Act if he or she engages in unfair or deceptive acts or practices in commerce.

122.    An act occurs in commerce if it takes place in the context of an ongoing business in which a defendant holds himself or herself out to the public.

123.    An act is unfair or deceptive where there is:

        a.    A representation practice or omission by the defendant that was likely to mislead customers;

        b.    The plaintiff interpreted the message reasonably under the circumstances; and

- 34 -

c.     The misleading effects were material, meaning that the conduct influenced plaintiff's conduct regarding the transaction.

124.    Plaintiff Daley and members of the Vermont Class are "consumers" as defined in Chapter 63 of Title 9 of the Vermont Statutes Annotated.

125.    The Class Vehicles are "goods" as defined in Chapter 63 of Title 9 of the Vermont Statutes Annotated.

126.    Defendant Toyota is a "seller" as defined in Chapter 63 of Title 9 of the Vermont Statutes Annotated.

127.    Defendant engaged in unfair and deceptive acts and practices by failing to disclose the Engine Defect to unsuspecting consumers, and by failing to adequately remedy or repair the Engine Defect.

128.    Defendants violated the Vermont Consumer Fraud Act by misrepresenting to Plaintiffs and the Vermont Class material facts concerning the true condition of the car at the time of sale or lease and the safety risks inherent due to the presence of the Engine Defect, which reasonably influenced Plaintiff's and members of the Vermont Class's decision to purchase the Class Vehicles.

129.    As a direct and proximate result of these knowing, wilful, and intentional violations of the Vermont Consumer Protect Act, Plaintiffs and members of the Vermont Class have suffered damages.

130.    Accordingly, pursuant to 9 V.S.A. § 2461(b), *et seq*., Plaintiff Daley and Vermont Class members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. In addition, Plaintiff and Vermont Class members are entitled to recover statutory, exemplary, treble, and/or

2:24-cv-01318-mkl    Document 1    Filed 12/02/24    Page 37 of 41

punitive damages, together with interest, cost of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

**COUNT IV**

**Violations of the North Carolina Unfair and Deceptive Trade Practices Act
N.C. Gen. Stat. § 75-1, *et seq.* ("NCUDTPA")
(On Behalf of Plaintiff Regan and the North Carolina Class)**

131.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

132.    This claim is brought by Plaintiff Regan on behalf of the North Carolina Class.

133.    The NCUDTPA was created to protect North Carolina consumers from unfair or deceptive business practices.

134.    North Carolina Plaintiff and North Carolina Class members purchased or leased Class Vehicles for personal purposes.

135.    Toyota had a duty to disclose the presence of the Engine Defect, but failed to reveal this material information to Plaintiff and North Carolina Class members.

136.    Accordingly, pursuant to N.C. Gen. Stat. § 75-1, *et seq.*, Plaintiff Regan and North Carolina class members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. In addition, Plaintiff and North Carolina class members are entitled to recover statutory, exemplary, treble, and/or punitive damages, together with interest, cost of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

- 36 -
PLAINTIFFS' CLASS ACTION COMPLAINT

## COUNT V

### Violations of the Oregon Unlawful Trade Practices Act N.C. Gen. Stat. § 75-1, *et seq.* ("OUTPA") (On Behalf of Plaintiff Holstien and the Oregon Class)

137.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

138.    The Oregon Unlawful Trade Practices Act was created to protect Oregon consumers from fraudulent or deceptive business practices.

139.    Plaintiff Holstien and Oregon Subclass members purchased or leased a Class Vehicle for personal purposes.

140.    Toyota had a duty to disclose the presence of the Engine Defect, but failed to reveal this material information to Plaintiff Holstien and Oregon Class members in violation of Or. Rev. Stat. § 646.607.

141.    Toyota's conduct constituted, among other things, the following prohibited fraudulent, deceptive, unconscionable, and unfair business practices: (a) misrepresenting that the Class Vehicles have characteristics, ingredients, uses, or benefits, which they do not have; (b) misrepresenting that the Class Vehicles are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not; and (c) engaging in fraudulent and deceptive conduct that creates a likelihood of confusion and misunderstanding.

142.    Toyota's conduct actually and proximately caused an ascertainable loss of money or property to Plaintiff Holstien (as set forth above) and members of the Oregon Subclass. Absent Toyota's unfair, deceptive, and/or fraudulent conduct, Plaintiff Holstien and Oregon Subclass members would have behaved differently and would not have purchased or leased a Class Vehicle. Toyota's omissions induced the Plaintiff Holstien to do so.

143.    Accordingly, pursuant to Or. Rev. Stat. § 646.605, *et seq*., Plaintiff Holstien and

Oregon Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages include the difference between the values of the Class Vehicles as represented (their prices paid) and their actual values at the time of purchase or lease, and other miscellaneous incidental and consequential damages. In addition, given the nature of Toyota's conduct, Plaintiff Holstien and Oregon Subclass members are entitled to recover all available statutory, exemplary, treble, and/or punitive damages, costs of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

## COUNT VI

### Unjust Enrichment
### (On Behalf of the Nationwide Class, or in the alternative, each of the State Classes)

144.    Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully set forth herein.

145.    This claim is brought by Plaintiffs on behalf of the Nationwide Class, or in the alternative, on behalf of the State Classes under those respective states' laws.

146.    This claim is pleaded in the alternative to the other claims herein.

147.    As a direct and proximate result of Toyota's omissions concerning and its failure to disclose the known Engine Defect, Toyota has profited through the sale and lease of the Vehicles. Although these Vehicles are purchased through Toyota's agents, the money from the Vehicle sales flows directly back to Toyota.

148.    As a result of its wrongful acts, concealments, and omissions of the Defect in its Vehicles, as set forth above, Toyota charged higher prices for the Vehicles than the Vehicles' true value. Plaintiffs and members of the class paid that higher price for their Vehicles to Toyota's

authorized distributors and dealers, which are in Toyota's control.

149.    Additionally, as a direct and proximate result of Toyota's failure to disclose known Defect in the Vehicles, Plaintiffs and class members have Vehicles that will require high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Toyota.

150.    Toyota has been unjustly enriched due to the known Defect in the Vehicles through the money paid that earned interest or otherwise added to Toyota's profits when said money should have remained with Plaintiffs and the class members.

151.    As a result of Toyota's unjust enrichment, Plaintiffs and the class members have suffered damages.

152.    Equity and good conscience militate against allowing Toyota to retain its ill-gotten gains, and require disgorgement and restitution of the same.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the proposed classes, pray for an order and judgment providing for the following:

A.    Certification of the classes under Federal Rule of Civil Procedure 23;

B.    Appointment of Plaintiffs as representatives of classes and their counsel as class counsel;

C.    Awarding compensatory and other damages for economic and non-economic damages;

D.    Awarding restitution and/or disgorgement;

E.    Issuance of an injunction requiring Defendant to cease and desist from engaging in the alleged wrongful conduct and to engage in a corrective advertising campaign to fully disclose the scope of the Engine Defect in the Class Vehicles;

F.      Award statutory pre-judgment and post-judgment interest on any amounts;

G.      Requre payment of reasonable attorneys' fees and recoverable litigation expenses

        as may be allowable under applicable law; and

H.      Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated: December 2, 2024                Respectfully submitted,

                                       _____

                                       Joshua L. Simonds, Esquire
                                       **THE BURLINGTON LAW PRACTICE, PLLC**
                                       2 Church Street, Suite 2G
                                       Burlington, VT 05401
                                       (802) 651-5370 Phone
                                       (802) 651-5374 Fax

                                       Benjamin F. Johns (*pro hac vice* to be filed)
                                       *bjohns@shublawyers.com*
                                       Samantha E. Holbrook (*pro hac vice* to be filed)
                                       *sholbrook@shublawyers.com*
                                       **SHUB & JOHNS LLC**
                                       Four Tower Bridge
                                       200 Barr Harbor Drive, Suite 400
                                       Conshohocken, PA 19428
                                       Phone: (610) 477-8380

                                       Andrew W. Ferich (*pro hac vice* to be filed)
                                       *aferich@ahdootwolfson.com*
                                       Alyssa Brown (*pro hac vice* to be filed)
                                       *abrown@ahdootwolfson.com*
                                       **AHDOOT & WOLFSON, PC**
                                       201 King of Prussia Road, Suite 650
                                       Radnor, PA 19087
                                       Telephone: (310) 474-9111
                                       Facsimile: (310) 474-8585

                                       *Counsel for Plaintiffs and the Proposed Classes*

PLAINTIFFS' CLASS ACTION COMPLAINT